IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BARBARA DIAZ,
on behalf of her minor child,
J.D.,
      Plaintiff,

vs.                                                    Case No. 5:06cv42/RS/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
      Defendant
_____/

## ORDER, REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying minor Plaintiff J.D.'s (hereafter "Plaintiff") application for Supplemental Security Income ("SSI") benefits under Title XVI of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded for further proceedings.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of Social Security. Therefore, he is automatically substituted as Defendant.  *See* Fed. R. Civ. P. 25(d)(1).

I.   PROCEDURAL HISTORY

On September, 10, 2002, Plaintiff's mother filed an application on behalf of Plaintiff for SSI benefits based on disability under Title XVI of the Act (Tr. 61–63).[2]  The application was denied initially and on reconsideration (Tr. 24–27, 52–54, 57–59).  On April 25, 2005, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act at any time during the period at issue (Tr. 15–23).  On January 19, 2006, the Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review (Tr. 3–6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal followed.

II.   FINDINGS OF THE ALJ

On April 25, 2005, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15–23):

1)    Plaintiff was born on December 18, 1994 and is in regular fourth-grade classes.

2)    Plaintiff has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R. § 416.924(b)).

3)    Plaintiff has a "severe" impairment; namely, attention deficit hyperactivity disorder ("ADHD") (20 C.F.R. § 416.924(c)).

4)    Plaintiff's ADHD does not meet or medically equal the severity of any impairment listed in Part B, or Part A, of Appendix 1 to Subpart P of Part 404 of Chapter 20 of the Code of Federal Regulations (20 C.F.R. §§ 416.924(d)(1), 416.925 and 416.926).

5)    Plaintiff does not have an "extreme" limitation in any domain of functioning, a "marked" limitation in two domains of functioning, and does not functionally equal the severity of the listings (20 C.F.R. §§ 416.924(d)(2) and 416.926a).

6)    Plaintiff's subjective complaints are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of the ALJ's decision.

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 29, 2006 (Doc. 9).

7)    Plaintiff has not been under a "disability" at any time from the alleged onset date through the date of the ALJ's decision (20 C.F.R. § 416.906).[3]

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

---

[3]Thus, the time frame relevant to this appeal is July 15, 2002 (alleged onset) (*see* Tr. 164) to April 25, 2005, the date of ALJ's decision.

In order for a child (defined as a person under 18) to qualify for disability benefits and establish his entitlement for a period of disability, he must be "disabled," as that term is defined under the Act and the Regulations promulgated thereunder by the SSA.  *See* 20 C.F.R. § 416.906 (2006); *see also* 42 U.S.C. § 1382c(a)(3)(C).  For a child to be found disabled, he must have "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  *Id.*  A physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.

A three-step sequential determinative process is used for children, rather than the five-step process used for adults (*compare* 20 C.F.R. § 416.924(a) (2005), *with* 20 C.F.R. §§ 404.1520(a)–(g) (2005)).  The first step is a determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  If so, disability is denied; if not, the evaluation continues to the next step.  The second step involves a determination of whether the child's physical or mental impairment, or combination of impairments, is "severe" (defined as a slight abnormality or combination of slight abnormalities that causes more than minimal functional limitations).  20 C.F.R. § 416.924(c).  If not, disability is denied; if so, the evaluation continues.  The third step involves a determination of whether the child's impairment(s)  meets, medically equals, or is functionally equal in severity to a Listed impairment. 20 C.F.R. § 416.924(d).  A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment.  *See* 20 C.F.R. § 416.925.  A child's impairment "medically equals" a Listed impairment if the medical findings are "at least equal in severity and duration to the listed findings."  20 C.F.R. § 416.926.  Finally, to determine whether the child's impairment is "functionally equal" in severity to a Listed impairment, the ALJ must decide whether it results in limitations that functionally equal the Listings, and the child's limitations are assessed in six broad areas of functioning called "domains."  *See* 20 C.F.R. § 416.926a(a).  If the child's

impairment meets or equals a Listing, and if the twelve (12) month durational requirement is otherwise met, disability is established.  If not, disability is denied.  *See* 20 C.F.R. § 416.926a.

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

A.    Personal History

Plaintiff was born on December 18, 1994, and has never been employed (Tr. 60, 181). Plaintiff's mother alleged that he became disabled on July 15, 2002, due to compulsive anxiety disorder, hyperactivity, depression, nightmares, and bedwetting; his mother also reported that Plaintiff "constantly smells his fingers" and sees ghosts and his deceased grandfather around the house (Tr. 55; *see also* Tr. 173–74).  Plaintiff first appeared before an ALJ on July 21, 2004 for a hearing (Tr. 262).  At that time Plaintiff was advised of his right to legal representation (Tr. 265). Although no formal testimony was taken from Plaintiff or his mother, Plaintiff's mother indicated to the ALJ that there was not a lot of medical evidence because she could not afford to take Plaintiff to a psychiatrist (Tr. 267).  After Plaintiff's mother expressed her desire to obtain legal counsel, the hearing was continued (Tr. 267–68).  Based on a conversation with Plaintiff's mother, the ALJ noted that he would order an IQ test and indicated that he wanted to obtain Plaintiff's school records (Tr. 270–270A).

Plaintiff's hearing reconvened on February 10, 2005 (Tr. 271).  Plaintiff again appeared with his mother, Barbara Diaz, and he was now represented by counsel (*see* Tr. 38, 271, 273).  Plaintiff's mother testified first, and Plaintiff was instructed to wait outside during her testimony (Tr. 273–74). Ms. Diaz noted that her son was ten years old, right-handed, and weighed 123 pounds, although she did not know his height (Tr. 274).  He was in the fourth grade and could read and write (Tr. 275). Ms. Diaz testified that Plaintiff's last grades were D's and F's, but he also had a few B's and C's, and he was advanced to the next grade (*id.*).  Ms. Diaz stated that she was not aware of any social workers being assigned to Plaintiff at school, but he was involved in counseling through Life Management, where he saw Psychologist Nancy Porter for one hour each month, and he also saw a Pediatrician, Dr. Jason Hatcher, on a monthly basis for treatment of ADHD (Tr. 220, 276–77).  Ms. Diaz was asked about Plaintiff's functional limitations (Tr. 277).  She noted that Plaintiff needs help dressing, cutting his food, preparing his bath (but he can bathe by himself), and selecting clothes (but he can dress himself) (Tr. 277, 283).  She also stated that Plaintiff wets the bed and has

problems focusing in school, understanding, staying still, paying attention, and completing his work, and that "all [she] get[s] is bad notes from teachers and notes about his behavior," and Plaintiff has been suspended from the bus for fighting and disobeying the bus driver (Tr. 280–81, 283).  Ms. Diaz further noted that Plaintiff participates in physical education and sports, has friends, plays football, plays his Play Station game, and rides his bicycle (Tr. 278, 282).  Ms. Diaz noted that Plaintiff used to take Zoloft, but he was now taking Remeron instead because the Zoloft caused insomnia (she also stated that prior to the Zoloft, Plaintiff took Adderall); he was also taking Concerta (Tr. 279).  She noted that the medications did not seem to help, and she did not notice any change when Plaintiff was on medications (*id.*).  However, she subsequently testified that the medications made Plaintiff cry and he seemed "really depressed" (Tr. 281).  She also noted that Plaintiff was saddened by the death of his grandmother's ex-husband, fights with his brother and other children, and is disobedient at home (Tr. 281–83, 285).  Nevertheless, Plaintiff has a good appetite, plays with other children, and did not do "that bad" on the IQ test (Tr. 281–82, 284).  Ms. Diaz further testified that when Plaintiff is upset, which is usually directed at her, he acts out by punching the walls or holding his fists, he becomes very angry, and then he cries (Tr. 287).  Finally, Ms. Diaz noted that Plaintiff used to "constantly smell his fingers," but he does this less now, and he often squints his eyes for no apparent reason (*id.*).

Next, Plaintiff testified at the hearing (Tr. 288).  He noted that he pays attention in school and studies, and that he was taking the following subjects: spelling, reading, science, math, and social studies (*id.*).  He has friends at school, but he does not get along with them (Tr. 289).  He acknowledged having poor grades but stated that he did not know why they were poor (*id.*).  He testified that he does not understand his teacher "that much," and he cannot focus on his homework (Tr. 290).  He has been disciplined for "being bad in class" (Tr. 290–91).  At home he likes to play his Play Station 2 game, watch television, and ride his bike; at school, he likes to play football (Tr. 291–93).  He stated that he has only one friend (Tr. 291).  Plaintiff notes that he does not sleep well at night because he has bad dreams, and his medications make him "hyper" (Tr. 292–93).

B.      Medical History

On July 18, 2002, Plaintiff presented to the Life Management Center of Northwest Florida ("LMC") for an initial evaluation (Tr. 195–202).  He was referred there for services by his mother due to concerns regarding his behavior, anxiety, and sleeping and eating patterns (Tr. 196, 201).  Ms. Diaz reported that Plaintiff "cries and screams in his sleep" and "talks to himself and smells his fingers all the time" (Tr. 196).  She further reported that his behaviors began "over the last month" and that Plaintiff was having trouble in school (Tr. 196–97).  Specifically, Ms. Diaz reported that Plaintiff was "destructive in class, won't listen, hits students," and his grades had fallen to the point where he was making mostly D's and F's (Tr. 197).  She also noted that Plaintiff is anxious, talks to himself, cannot stay still, and is defiant and unmanageable at home; he also cries "for his father" who was incarcerated at the time of Plaintiff's evaluation (Tr. 197).  A "Developmental Child Mental Status Evaluation" noted, in pertinent part, the following: a twenty-pound weight gain in two months, marked or repeated episodes of non-alertness, slight or occasional episodes of fidgety behavior, and marked or repeated episodes of compulsive behavior (i.e., smelling his fingers and constantly eating) (Tr. 198–99).  Plaintiff was diagnosed with anxiety disorder, not otherwise specified (NOS) (Axis I); "V71.09" (Axis II); "none" (Axis III); "primary support group, educational" (Axis IV); and "CGAS=50" (Axis V)[4] (Tr. 195, 202).  A goal was set for Plaintiff as follows: "[c]lient will perform at an age-appropriate level of educational, social, and family functioning," and it was noted that Plaintiff should be referred for a psychiatric evaluation (Tr. 195).

Plaintiff returned to LMC on August 13, 2002, and was seen by Nadeen Bonica, a Psychiatric ARNP (Tr. 191–93).  His chief complaint was noted to be, "he smells his fingers and cries in his sleep" (Tr. 191).  ARNP Bonica also noted Ms. Diaz's complaints that Plaintiff screams in his sleep, talks to himself, and claims to see his grandmother's deceased boyfriend, as well as Ms. Diaz's report that the onset of Plaintiff's symptoms was June 2002 (Tr. 191).  Moreover, ARNP Bonica noted that Plaintiff's academic performance had declined over the last year, and his teachers

---

[4]Psychiatric diagnoses are categorized by the Diagnostic and Statistical Manual of Mental Disorders.  *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 25–31 (4th ed. text rev. 2000) (hereinafter "DSM").  The DSM uses a multiaxial or multidimensional approach to diagnosing and assesses five dimensions, which are referred to as Axis I–Axis V.  *See id.*

reported that he was hyper, distracted, oppositional, and had problems with his peers, such as hitting them or spitting on them (Tr. 191).   When questioned, Plaintiff told ARNP Bonica that he is concerned that his fingers are dirty; that when he talks to himself, he is talking to "nobody"; that he often cries for his father who is in prison, and he screams and cries whenever he has to leave the prison after visiting his father; and that he has recently begun compulsively overeating (Tr. 191–92). ARNP Bonica noted that Plaintiff had no prior psychiatric history, and that the death of his grandmother's boyfriend was a "significant loss" to Plaintiff (*id.*).   It was further noted that Plaintiff "attained developmental milestones within [a] normal time frame," and Plaintiff was in regular classes at Cottondale Elementary School (Tr. 192).   In summarizing Plaintiff's mental status examination, ARNP stated the following:

> MENTAL STATUS EXAM: Reveals an overweight, hyperactive, Hispanic male whose second language is English.  His affect appears sullen and he acknowledges feeling sad with depressed mood.  He reports visual hallucinations of grandmother [sic] dead boyfriend.  While lacking insight, [Plaintiff] has been observed smelling his fingers repetitively on numerous occasion[s] and when questioned acknowledges that he fears that they are dirty.  He denies current suicidal or homicidal ideation, intent or plan.  He is alert and inattentive to the conversation, which occurred.  He is inattentive and distractible [sic].  He does not process judgment or insight but is able to say that he misses his father.

(*id.*).   In pertinent part, Plaintiff was assessed with "Adjustment Disorder with Anxious and Depressed Mood, ADHD Combined Type, and Obsessive Compulsive Disorder" (Axis I); an Axis II diagnosis was "deferred"; "Home and School Behavior Problems, Father Incarcerated, Death of Surrogate Grandfather" (Axis IV); and a GAF of 50 (Axis V)[5] (*id.*).   Plaintiff was prescribed Adderall and instructed to return for follow-up in three to four weeks, counseling was recommended,

---

[5]Global assessment of functioning (GAF) is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  *See* DSM, *supra* n.4, at 30–32.  It may be expressed as a numerical score.  *Id.* at 32.  A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  It is believed that the score noted in July 2002 was also a GAF score of 50, although it was reported as a "CGAS" score (*see* Tr. 195, 202).

and the following goal was set, "[Plaintiff] will obtain a [GAF] of 65 or above and maintain it for a minimum of 3 consecutive  months"[6] (Tr. 193–94).

Plaintiff returned to LMC on September 16, 2002, and was seen by Amor Bouraoui-Karoui, M.D., a psychiatrist (Tr. 190).  Plaintiff's Axis I diagnoses remained the same as those diagnosed in August 2002 by ARNP Boncia (*see id.*).  Plaintiff's Adderall was continued, and Plaintiff was additionally prescribed Zoloft and instructed to return in about one month (Tr. 190).  Plaintiff failed to appear for his next appointment, which was scheduled for October 14, 2002 (Tr. 189).  Plaintiff returned on November 23, 2002, and met with Ahmed Mohamed, M.D., a psychiatrist (Tr. 187).  His Axis I diagnoses remained the same (*see id.*).  Ms. Diaz reported to Dr. Mohamed that Plaintiff initially responded well to the medication, but he was presently hyperactive (Tr. 187).  She also noted that Plaintiff's academic performance was good, he had no side effects from the medications and no changes in his appetite or sleeping patterns, and he had no tics or tremors (*id.*).  Dr. Mohamed continued Plaintiff's Adderall and Zoloft, but the Zoloft dosage was increased, and Plaintiff was instructed to return in six weeks (Tr. 187–88).  In summarizing Plaintiff's mental status examination, Dr. Mohamed noted, "Speech is normal.  Affect is euthymic.  No paranoia nor delusions.  He appeared somewhat hyperactive and restless, however he did not take medication today.  No suicidal or homicidal ideation.  No auditory or visual hallucinations.  He is alert and oriented x 3." (Tr. 187).

On July 1, 2004, Plaintiff presented to the Panhandle Family Medicine, P.A., in Chipley, Florida and was seen by Jason D. Hatcher, D.O. (Tr. 215).  Dr. Hatcher noted that Plaintiff was taking Adderall and Zoloft and that he seemed to be doing "pretty well with both" (Tr. 216).  His mother reported that Plaintiff was able to focus better while on the medication (*id.*).  Ms. Diaz also reported that Plaintiff's grades were fairly poor, but he was promoted to the fourth grade nevertheless (*id.*).  It was noted that Plaintiff enjoys math, reading, and physical education (*id.*).  He

---

[6]A score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *See* DSM, *supra* n.4, at 32.

was diagnosed with ADHD, obesity, and sleep dysfunction (*id.*).  Plaintiff was continued on Zoloft and Adderall (*id.*).[7]

On August 12, 2004, Dr. Hatcher wrote a letter concerning Plaintiff's claim for disability (Tr. 220).  He noted that Plaintiff suffers from ADHD, and based on Plaintiff's blood work, his inattentiveness was most likely a psychiatric disorder, not a medical disorder (*id.*).  Dr. Hatcher noted that Plaintiff would continue to have difficulty in school, and because Dr. Hatcher had just begun treating Plaintiff, he opined that Plaintiff would "likely need a number of adjustments to his treatment before we have a clear idea of if he's going to show any significant improvement" (*id.*).

Plaintiff returned to Dr. Hatcher's office on August 17, 2004 (Tr. 235–36).  Plaintiff's mother reported that he was having more confrontational behavior and was more emotional (Tr. 235).  Dr. Hatcher decided that this may be due to the Adderall, and he switched Plaintiff to Concerta (*id.*).  Dr. Hatcher was aware that Plaintiff was seeking disability, but he opined that he was "not convinced that [Plaintiff] is disabled as such at this point although I may decide that in the future if we don't get good results" (*id.*).  Dr. Hatcher discussed the results of Plaintiff's blood work, noting that it showed some signs of low iron levels and elevated liver enzymes (*id.*).

Plaintiff followed up with Dr. Hatcher on August 23, 2004 (Tr. 237).  He reported doing well and focusing better (*id.*).  Physically, Plaintiff was healthy and normal, except that his iron levels were below normal, and his liver enzymes apparently remained elevated (Plaintiff's lab work ruled out hepatitis, so Dr. Hatcher intended to check Plaintiff's enzyme levels again in a couple of months to make sure things were normalizing) (*id.*).  Plaintiff's mood, emotions, and affect were normal (Tr. 238).  He was diagnosed with iron deficiency anemia secondary to inadequate dietary iron intake, ADHD, obesity, and sleep dysfunction (*id.*).  Dr. Hatcher prescribed Niferex to increase Plaintiff's iron level (Tr. 237).

Plaintiff returned to Dr. Hatcher on September 9, 2004, and it was noted that "things are somewhat better, somewhat not better" (Tr. 238).  Plaintiff's grades were better, but his behavior

---

[7]Another report from Dr. Hatcher, also dated July 1, 2004, suggests that Plaintiff's Adderall was discontinued and Concerta was prescribed instead (*see* Tr. 232).  Further, the report reflects that Niferex-150 Forte was also added due to Plaintiff's low iron level  (*id.*; Tr. 237).  The court cannot reconcile this discrepancy, but it appears that Plaintiff was not actually prescribed Concerta and Niferex until August 2004 (*see* Tr. 235–37).

remained a serious problem (*id.*).  Plaintiff's mood, emotions, and affect were again noted to be normal, and Dr. Hatcher's diagnoses remained the same (Tr. 239).  Plaintiff was tolerating his medications, and Dr. Hatcher thought it was appropriate to increase the Concerta and Zoloft (Tr. 238).

Plaintiff was evaluated at LMC again on October 20, 2004 (Tr. 242).  He was noted to be hyperactive, fidgety, anxious, and restless, and his poor academic performance was noted (*id.*).  Plaintiff's mother reported that Plaintiff had behavioral problems, trouble sleeping, and an eating problem (Tr. 244).  The treatment plan was to identify the source of Plaintiff's anxiousness and hyperactivity and to explore feelings and increase his performance at school with therapy (Tr. 242).  A mental status examination revealed no "marked or repeated problems," except with regard to Plaintiff's sleep, and "slight or occasional" hyperactivity, withdrawnness, unhappiness, worry, and eating problems (Tr. 245–46).  It was noted that Plaintiff enjoys running and watching football (Tr. 248).  Plaintiff returned to LMC on November 16, 2004 (Tr. 256).  Plaintiff's affect was noted to be "appropriate" (*id.*).  It was also noted that Plaintiff was in therapy, actively participated in therapy, and appeared "ready to commit to therapy" (*id.*).

Plaintiff returned to Dr. Hatcher on November 18, 2004 (Tr. 251).  Dr. Hatcher noted that Plaintiff's behavior was better at home and at school, but Plaintiff continued to have some poor grades and some behavioral problems at school (*id.*).  For example, Plaintiff was suspended for forging his mother's name and the principal's name on a slip which allowed the bus driver to drop him off at a different house (*id.*).  Dr. Hatcher also noted, however, that Plaintiff did "relatively well" when he was on his medications, and Plaintiff had recently run out of medication when he went out of town (*id.*).  In summing up Plaintiff's psychiatric condition, Dr. Hatcher made the following observations:

> Speech pattern is spontaneous with good articulation and rate.  Thought processes including rate, content, reasoning, and computation are felt to be normal.  Thought association seems logical and intact.  [Plaintiff] has no evidence of hallucination, delusion, suicidal thoughts, or obsessions.  [Plaintiff's] judgment and insight about everyday activities and situations seems normal.  Mental status exam reveals orientation to time, place, and person.  Recent and remote memory are intact.  Attention span an[d] concentration are in normal limits.  [Plaintiff's] ability to name objects and repeat phrases reveals language skills to be intact.  Awareness of current

events and past history reveal an adequate fund of knowledge.  Estimate of mood and affect show no evidence of depression, excessive anxiety, or agitation.

(Tr. 252).

Dr. Hatcher saw Plaintiff again on December 14, 2004 (Tr. 253).  It was noted that Plaintiff was doing "relatively well," his behavior had been "ok," his appetite had been good, and "there [were] not a lot of complaints today" (*id.*).  Plaintiff's mood, affect, and emotions were again noted to be normal (Tr. 254).

Plaintiff was evaluated by psychologist, Lawrence V. Annis, Ph.D., on October 5, 2004 at the request of the SSA (Tr. 224).  At the time of Plaintiff's evaluation, he was taking Zoloft and Concerta (the Concerta apparently replaced the Adderall) (*see id.*).  Plaintiff told Dr. Annis that he had a good relationship with his mother, father (who was released from prison in May 2004), and his younger brother, whom he described as a "good friend" (Tr. 225).  He said that he liked school and liked math the best (*id.*).  He also stated that he had lots of friends and wanted to be a lawyer when he grew up (*id.*).  He was attracted to the legal profession because he liked the idea of helping people (*id.*).  His self-care skills were almost complete, although he occasionally had to be reminded to take baths (*id.*).  He dresses without assistance and ties his shoes, but his mother cuts his food (*id.*).  His reported that his primary pastimes include listening to music, playing video games, bicycle riding, playing basketball, and spending time with his friends (*id.*).

Dr. Annis noted that Plaintiff's behavior was fidgety and excessive (*id.*).  His mood was cheerful, and Plaintiff stated that he was "happy" and believes he has usually been happy (*id.*).  It was noted that Plaintiff was "consistently polite and cooperative," well articulated, easily understood, and seemed to understand Dr. Annis's questions and comments without difficulty (*id.*).  His concentration was good, he attended well to the interview and assigned tasks, there was no decline in attention, and Plaintiff was not distracted by anything (Tr. 226).  Plaintiff did report seeing his deceased grandfather, noting that his grandfather would ask Plaintiff if he needed help, but that his grandfather did not command or threaten him in any way (*id.*).  Although Plaintiff's mother reported that his memory was poor, Plaintiff noted that his memory was good, and testing led to that conclusion (*id.*).  Dr. Annis administered the Wechsler Intelligence Scale for Children ("WISC"), 3rd Edition (*id.*).  Plaintiff appeared to try his best, and Dr. Annis opined that his test

scores appear to accurately reflect his current intellectual functioning (*id.*).  Plaintiff had a verbal IQ of 91, a performance IQ of 81, and a full scale IQ of 86, all of which were in the normal range (IQ 85–115) (*id.*).

Dr. Annis diagnosed Plaintiff with ADHD and adjustment disorder (Tr. 227).  Dr. Annis opined that the typical course is for the symptoms of ADHD to reduce as a child ages, regardless of treatment (*id.*).  He also stated that it is possible to see gains in Plaintiff's IQ over time (*id.*).  It was noted that Plaintiff can remain on task for brief periods without instruction and is able to carry out simple instructions (Tr. 228).  He can attend to his immediate needs with little assistance (*id.*).  He is able to help with chores, but requires guidance, direction, and supervision (*id.*).  He does, however, appear to have a reduced ability to participate in difficult social interactions that require patience or in careful or protracted concentration (*id.*).  Finally, Dr. Annis noted that evidence "was found of [a] major mental impairment that would be expected to adversely affect work-related mental abilities" (*id.*).  Thus, at age nine, Plaintiff would be limited to simple and unskilled work in supervised settings (*id.*).  However, if Plaintiff's attentional problems were resolved, he would be expected to have a greatly increased ability in vocational, social, and educational arenas (*id.*).

Dr. Annis completed a childhood functional assessment questionnaire on October 5, 2004 (Tr. 229).  He determined that Plaintiff had "less than marked" limitations in acquiring and using information; "marked" limitations in attending and completing tasks and in interacting and relating to others; and "no limitation" in moving about and manipulating objects, self-care, and health and well-being (*id.*).

C.      Other Information Within Plaintiff's Claim File

The file contains a "Function Report — Child (Age 6 to 12th Birthday)," completed by Plaintiff's mother on September 3, 2002 (Tr. 123).  In pertinent part, Ms. Diaz noted that Plaintiff was sometimes forgetful (Tr. 126).  She further noted that Plaintiff was able to read, spell most three to four letter words, and tell the time, but he had difficulty writing a simple story with more than six to seven sentences and with math, including an inability to make change or subtract numbers over ten (Tr. 127).  In describing Plaintiff's progress, Ms. Diaz wrote, "he's learned (a lot) how to read and write and he knows math pretty good — he's doing better" (*id.*).  She also noted that he had no physical limitations, besides being unable to swim or roller skate, and his impairment(s) did not

affect his behavior with other people (Tr. 128–29).  In general, Plaintiff was noted to have no difficulties cooperating with others and taking care of his personal needs (*see* Tr. 130).  However, Ms. Diaz opined that Plaintiff's ability to "pay attention and stick with a task" was limited (Tr. 131). In conclusion Ms. Diaz noted, "He's very hard-head [sic] never wants to do what he's told to do [, and] I have to repeat myself more than once . . . [Plaintiff] has improved a little since he's been on Adderall and [through] contact counseling at life management" (Tr. 131–32).  Similarly, on January 17, 2003, Plaintiff's mother reported that Plaintiff's medications (Adderall and Zoloft) "calm him down some and he does a lot better in school" (Tr. 152, 154).

On December 2, 2002, one of Plaintiff's teachers, Jeannie Ivey, completed a "Teacher/Counselor Questionnaire" (Tr. 133–36). Ms. Ivey first noted that she sees Plaintiff "5 days a [week,] 8 hours a day" (Tr. 133).  She described Plaintiff's academic level as being the same as unimpaired students of the same age, noting that Plaintiff's assignments were of similar length and difficulty as the assignments of other students in her class (*id.*).  Plaintiff was noted to be respectful and to get "along with everybody OK at all times" (Tr. 134).  Ms. Ivey commented that Plaintiff had no problems in the following areas: speech or language, effective communication, extra-curricular or social activities, staying on task, completing assignments on time, hygiene, grooming, and self-care skills (Tr. 134–35).  Finally, Ms. Ivey noted that no extra supervision was required to accommodate Plaintiff's impairment and that there had been no "sudden worsening in the child's functioning or behavior," such as becoming disruptive in class or starting to fail tests (Tr. 136).

On December 26, 2002, at the initial level of review, a State Agency medical consultant reviewed Plaintiff's medical records, and determined that Plaintiff's impairments were not severe and did not meet, medically equal, or functionally equal a listed impairment (Tr. 203–08).  The same finding was made at the reconsideration level by another consultant (Tr. 209–14).

On January 22, 2003, a staff member with the SSA noted that Plaintiff had no apparent difficulties with basic life skills, such as reading, writing, speaking, and understanding (Tr. 145–46).

On February 14, 2003, Plaintiff's mother was interviewed by a SSA staff member (Tr. 140). Ms. Diaz advised that Plaintiff was calmer and not as hyper on Adderall, but he continued to have nightmares almost every night and wets the bed when he has nightmares (*id.*).  She noted that

Plaintiff was also taking Zoloft and that sometimes his medication made him refrain from eating for two to three days and even made him vomit once (*id.*).

Plaintiff's grades from two, nine-week, periods during the 2005 school year (fourth-grade) are included in the record (Tr. 75).  They reflect one B, two C's, one D, four F's, two "satisfactories," and one "poor" (*id.*).  The file also contains assessments from Plaintiff's fourth-grade teachers, finding that Plaintiff is "very often" distracted, inattentive, disruptive, fidgety, etc., and that his courses are generally "problematic" for him (*see* Tr. 76, 78, 80).  Similarly, progress reports reflect failing grades and unsatisfactory behavior, noting that Plaintiff is disruptive in class, and needs to settle down and pay attention (*see, e.g.*, 83–84, 89).  Other school records reflect that Plaintiff previously did better.  For example, his first-grade average grades were three B's, one C, and "satisfactories," and his conduct was noted to be "satisfactory" in every class (Tr. 96).  He was similarly noted to be average or above average in kindergarten (Tr. 110).

V.   DISCUSSION

Plaintiff raises three issues on appeal (Doc. 16 at 18–19).  Specifically, Plaintiff alleges that the ALJ's credibility finding does not comply with the law of the Eleventh Circuit, the ALJ erred in finding that Plaintiff's ADHD did not meet or equal Listing 112.11, and the ALJ's functionality findings "contain serious defects" (*id.*).

A.   ALJ's Credibility Finding

Plaintiff alleges the ALJ erred because his credibility finding does not comply with the law of the Eleventh Circuit (Doc. 16 at 25).  Here, regarding Plaintiff's subjective complaints, the ALJ simply noted that, "[t]he child's subjective complaints are considered credible only to the extent they are supported by the evidence of record as summarized in the text of [the ALJ's] decision." (Tr. 23).  The ALJ did not identify the child's "subjective complaints," and he did not specifically indicate which ones he found incredible.  Thus, Plaintiff contends, the ALJ's decision "does not provide sufficient rationale articulating explicit and adequate reasons for discrediting" Plaintiff's testimony (Doc. 16 at 25).  In response, the Commissioner contends that the ALJ need not specifically refer to every piece of evidence in his decision, "so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical conditions as a whole.' (citing <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005)

(quoting Foote v. Chater, 67 F.3d 1553, 1567 (11th Cir. 1995) (internal quotation omitted)).” (Doc. 17 at 10).

As articulated in MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986), “[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true.”  See also Holt v. Sullivan, 921 F.2d at 1223.  “Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  As noted by the Commissioner, the credibility determination does not need to cite “particular phrases or formulations, but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [plaintiff’s] medical condition as a whole.”  Dyer, 395 F.3d at 1210 (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff’s subjective pain testimony must be based upon substantial evidence. Jones v. Dep’t. of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991).

This court concludes that the ALJ erred because his decision does not provide a clear rationale for his  rejection of Plaintiff’s subjective complaints, and his reasons are not obvious from text of the opinion.  Thus, the court cannot determine whether the ALJ’s reasons are based upon substantial evidence.  Moreover, it is unclear which complaints of Plaintiff the ALJ accepted as true and which the ALJ rejected as incredible.  Additionally, the court notes that the ALJ failed to indicate whether he fully accepted the testimony of Plaintiff’s mother.  Upon remand, if the ALJ fails to fully credit Ms. Diaz’s testimony, he should articulate explicit and adequate reasons for doing so.  See Nettles v. Apfel, 64 F. Supp. 2d 1171, 1172 (M.D. Ala. 1999); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner’s findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. See, e.g., Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir. 1991).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt.  Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir.1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir.1991) ("The record . . . is fully developed and there is no need to remand for additional evidence."); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216–17 (11th Cir. 1991); (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

The court finds a remand to be the appropriate remedy in the instant case, as disability has not been established without a doubt.  Although the court is required to accept all of a plaintiff's complaints as true if an ALJ fails to properly discount the complaints, here, the court still cannot conclude without a doubt that Plaintiff is disabled.  For example, Plaintiff testified that he pays attention in school and studies (Tr. 288).  He has poor grades and does not get along with friends at school (Tr. 289).  He does not always understand his teachers, has trouble focusing, and has been disciplined for "being bad in class" (Tr. 290–91).  He is interested in activities such as football and riding his bike (Tr. 291–83).  He noted that he has difficulty sleeping, bad dreams, and is hyper (Tr. 292–93).  During an evaluation, he reported crying over his father, seeing his deceased grandfather, and smelling his fingers (*see, e.g.*, Tr. 191–92).  Even if all of Plaintiff's subjective complaints were accepted as true, however, they do not establish disability beyond a doubt.  Indeed, they could be interpreted as suggesting that Plaintiff is not disabled, as he indicated that he pays attention in school, and the only severe impairment found by the ALJ was ADHD.[8]  Similarly, although it is not clear that the ALJ discredited any of Ms. Diaz's testimony, it cannot be said as a matter of law that the mother's testimony and the medial evidence do or do not support a finding of disability.  Thus, the case should be remanded to give the Commissioner an opportunity to reconsider Plaintiff's subjective complaints and those of his mother.  If it is determined that either of their complaints are not fully credible, those complaints should be identified, and the reasons for discounting them should be explicit and supported by the record..

---

[8]As discussed more fully *infra*, the consideration of whether a child's impairment meets or equals a listed requires a detailed and complicated analysis.

B.    ALJ's Finding Regarding ADHD and Listing 112.11

Plaintiff's claim relates to the ALJ's adjudication at step three of the benefit analysis for children.  *See* 20 C.F.R. § 416.924(d).  After finding at step one that Plaintiff had not engaged in substantial gainful activity and finding at step two that Plaintiff had the severe impairment of ADHD, the ALJ found that Plaintiff's ADHD did not meet or equal the requirements of any of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1, which would necessarily include Listing 112.11 — although the ALJ did not specifically mention that Listing (*see* Tr. 15–23).  Plaintiff asserts that the ALJ erred in failing to find that Plaintiff met Listing 112.11 and in failing to mention Listing 112.11 (Doc. 16 at 19–23).  In response, the Commissioner asserts that such error, if any, is harmless because the ALJ's findings "confirm rejection of the listings in a manner readily reviewable" by the court (citation omitted) (Doc. 17 at 5–6).

In support of his contention, Plaintiff relies upon Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003), wherein the Seventh Circuit held that an ALJ's decision that summarily concluded that a child's impairments did not meet or medically equal a listing was "devoid of any analysis that would enable meaningful judicial review."  *Id.*  The Seventh Circuit has also held, however, that "it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five . . . , we consider the ALJ's treatment of the record evidence in support of both of his conclusions at steps three and five."  Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004).  Similarly, the Third Circuit has noted that it did not "require the ALJ to use particular language or adhere to a particular format in conducting his analysis," but required the court to consider whether the ALJ's decision "read as a whole" included sufficient analysis and weighing of the evidence to allow for meaningful judicial review.  Jones v. Barnhart, 364 F.3d 501, 505 (3rd Cir. 2004).  Likewise, the Tenth Circuit in Fischer-Ross v. Barnhart, 431 F.3d 729, 733–34 (10th Cir. 2005), clarified its holding in Clifton v. Chater, 79 F.3d 1007 (10th Cir. 1996), noting that "[a]n ALJ's findings at other steps of the sequential evaluation process may provide a proper basis for upholding a step three conclusion." Fischer-Ross, 431 F.3d at 733.  The Tenth Circuit has also noted that "where an ALJ provides

findings, . . . that confirm rejection of the listings in a manner readily reviewable," reversal or remand is not appropriate.  *Id.  See also* <u>Senne v. Apfel</u>, 198 F.3d 1065 (8th Cir. 1999).[9]

Thus, the issue before the court is whether the ALJ's findings confirm his rejection of Listing 112.11 in a manner that is "readily reviewable" by this court, despite the ALJ's failure to mention the particular listing.  Additionally, the court will address whether the ALJ properly determined that Plaintiff's impairment did not meet Listing 112.11.

Listing 112.11 reads, in relevant part, as follows:

112.11  Attention Deficit Hyperactivity Disorder:  Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
    A.  Medically documented findings of all three of the following:
        1. Marked inattention; and
        2. Marked impulsiveness; and
        3. Marked hyperactivity;
AND
    B. . . .. for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

Paragraph B2 of 112.02 reads, in relevant part, as follows:

2.  For children (age 3 to attainment of age 18), resulting in at least two of the following:
    a.  Marked impairment in age-appropriate cognitive/communicative functioning, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests . . . or
    b. Marked impairment in age-appropriate social functioning, documented by history and medical findings  .  .  . and including, if necessary, the results of appropriate standardized tests; or
    c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings . . . and including, if necessary appropriate standardized tests; or

---

[9]The court notes that the claimed error in the instant case was at step three of the sequential analysis (which is like the step three analysis in an adult disability case); there is no step five analysis in a child disability case (step five in an adult case concerns the availability of other work a claimant can perform if his impairments prevent him from performing his past relevant work).

d. Marked difficulties in maintaining concentration, persistence or pace.

As previously noted, the evaluation at step three requires consideration of whether an impairment meets, medically equals, or functionally equals a Listing.  *See* 20 C.F.R. §§ 416.925, 416.926, and 416.926a(a).  To "meet" a listed impairment, a child must demonstrate that he meets both the "A" and "B" criteria of the listing.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1.  "A" criteria are medical findings and "B" criteria "describe impairment-related functional limitations."  *Id.*  Thus, to meet the ADHD listing, Plaintiff must show: (1) a marked limitation in inattention, impulsiveness, <u>and</u> hyperactivity (the "A" criteria),[10] and (2) a marked impairment in at least two of the "B" criteria listed above.  20 C.F.R. § 112.11.  A "marked" limitation is one which "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(2)(i).  It "is 'more than moderate' but 'less than extreme.' " *Id.*

If a child's impairments do not "meet" a listed impairment, they may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment.  *See* 20 C.F.R. §§ 416.926, 416.926a.  A child's impairment "medically equals" a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 416.926(a).  Generally, medical equivalence can be found in two ways.  *Id.* at 416.926(a).  First, the child has an impairment described in the Listings but does not exhibit one or more of the medical findings specified in a particular Listing or the child exhibits all of the medical findings, but one or more of the findings is not as severe as specified in the Listing.  *Id* at 416.926(a)(1).  Second, the child has an impairment that is not described in the Listings, or has a combination of impairments, none of which meets or medically equals a Listing, but the medical findings for his impairment(s) medically equal a closely-analogous listed impairment.  *Id.* at 416.926(a)(2).

Finally, if a child's impairments do not meet or medically equal a listed impairment, the Commissioner must consider whether the impairment results in limitations that "functionally equal" the Listings.  *Id.* at 416.926a.  An impairment functionally equals a listed impairment when the child demonstrates a " 'marked' limitation[ ] in two domains of functioning or an 'extreme' limitation in

---

[10]An impairment that shows some but not all of the criteria, no matter how severely, does not qualify.  *See* <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990).

one domain." *Id.* at § 416.926a(a).  Although other relevant factors, such as those found in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929 are considered, domain analysis focuses on six "broad areas of functioning intended to capture all of what a child can or cannot do."  *Id.* at 416.926a(a) and 416.926a(b)(1).  The domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being.  *Id.* at 416.926a(b)(1).

Turning to the instant case, the ALJ noted "the evidence failed to establish that the child's impairment(s) meets or medically equals a listed impairment" (Tr. 18).  Thus, the ALJ stated, he must "determine whether the child has an impairment . . . that is 'functionally equal' to the listings" (Tr. 18).  The ALJ next stated that in conducting the "functionally equivalent" analysis, he "has examined the entire record to determine how the child performs in six 'domains of functioning,' " and he considered each of the six domains listed in 20 C.F.R. § 416.926a(b)(1) (Tr. 18–22).  The ALJ then concluded that Plaintiff "does not functionally equal, singly or in combination, any listed impairment" (Tr. 22).

Plaintiff asserts that the ALJ erred in failing to find that Plaintiff meets Listing 112.11, asserting that each of the "A" criteria and two of the "B" criteria of the Listing (specifically, marked impairment in age-appropriate social functions and marked difficulties in maintaining concentration, persistence, or pace) are satisfied (*see* Doc. 16 at 20).  Alternatively, Plaintiff appears to assert that his impairment medically equals Listing 112.11 (*see id.* at 22).  Furthermore, Plaintiff contends that the ALJ erred in failing to provide a rationale for his conclusion that Plaintiff's impairment did not meet or medically equal a listed impairment (Doc. 16 at 22).

The Commissioner urges the court to affirm its final decision because the ALJ properly analyzed the six domains of functioning to determine if Plaintiff's impairment was functionally equal to a listed impairment, even though the ALJ did not specifically mention the Listing,[11] and further that his analysis of the domains provides a basis for upholding the ALJ's finding that Plaintiff did not meet or medically equal a listing (Doc. 17 at 5–8).

---

[11]Although it would have been the better course, the court is not overly concerned with the ALJ's failure to specifically mention Listing 112.11.  In this case the ALJ found only one severe impairment, ADHD, and Listing 112.11 is specific to that impairment.

In essence, the Commissioner urges the court to take each domain finding made by the ALJ during the "functionally equivalent" analysis, compare those findings with what is required to either meet or medically equal a listing, and affirm the ALJ's decision on that basis (*see id.*).  Initially, the court notes that, although the criteria for determining whether an impairment meets, medically equals, or functionally equals a Listing overlap, they are not identical.  Moreover, if the court were to attempt to interpret the ALJ's decision as the Commissioner has suggested, the court could conclude that the ALJ decided Plaintiff did not meet Listing 112.11 because each of the "A" criteria were not met (*see* Tr. 20 (ALJ's discussion of the "Attending and Completing Tasks" domain, finding that Plaintiff has "less than 'marked' limitations")).  Alternatively, the court could conceivably conclude that the ALJ found Plaintiff did not meet at least two of the "B" criteria, based on the ALJ's overall discussion of the six domains.  This illustrates the problem with the Commissioner's suggestion.  This court cannot definitively determine the basis of the ALJ's decision that Plaintiff did not meet the Listing and, therefore, cannot determine whether his reasons have substantial support in the record.  Furthermore, the court would be creating its own justification for the ALJ's decision, which is not a proper role for this court.

Finally, in addition to failing to explain why Plaintiff did not meet the Listing, the ALJ also failed to explain his conclusion that Plaintiff did not medically equal the Listing — further complicating review of his decision.  Thus, the ALJ's opinion provides no clear road map for this court's review.  *Cf.* Fischer-Ross, 431 F.3d at 729 (ALJ's confirmed findings at other steps of his analysis, coupled with indisputable aspects of the medical record, conclusively precluded claimant's qualification under the Listings).

In sum, the court concludes that the ALJ's findings regarding whether Plaintiff's impairment "meets" or "medically equals" one of the listed impairments do not confirm rejection of Listing 112.11 in a manner that is "readily reviewable" by this court.

As before, the court concludes that the record does not establish disability without a doubt and that a remand is the appropriate remedy for the ALJ's error.  On remand, the Commissioner should properly analyze Plaintiff's impairment(s).  The analysis should specifically identify the Listing under which Plaintiff's impairment(s) is considered, and the analysis should comport with

the Regulations and include an explanation at each stage of step three (that is, whether the impairment(s) meets, medically equals, or functionally equals a listed impairment).

        C.        <u>ALJ's Functionality Findings</u>

Finally, Plaintiff asserts that the "ALJ's functionality findings in the domain areas of attending and completing task[s] and interacting and relating with others contain serious defects" (Doc. 16 at 23).  In light of the undersigned's recommendation the this case be remanded for further proceedings, the court need not address these arguments.[12]  Upon remand, the Commissioner should reconsider Plaintiff's impairment(s) and make new functionality findings.

For the foregoing reasons, the court cannot find that the Commissioner's decision is supported by substantial evidence; therefore, the case should be remanded for further proceedings. *See* 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560.

Accordingly, it is **ORDERED**:

That the clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to **REMAND** this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this <u>11</u><sup>th</sup> day of June 2007.


                           */s/ Elizabeth M. Timothy*
                           **ELIZABETH M. TIMOTHY**
                           **UNITED STATES MAGISTRATE JUDGE**

---

[12]Should the district court disagree with the undersigned's recommendation that this case be reversed and remanded, the case should be referred back to the undersigned to address this sub-issue.

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).